**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEVIN JESSE WALKER, | NO. 1:02-cv-05801-AWI-GSA-PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| RAYMOND ANDREWS, et al., | (ECF No.  161) |
| Defendants. | OBJECTIONS DUE IN TWENTY DAYS |

Plaintiff is a former federal prisoner proceeding pro se in this civil rights action.[1]  The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

## I.    Relevant Procedural History

This action proceeds on the August 29, 2005, second amended complaint.  Plaintiff, formerly in federal custody at the Federal Correctional Institution at Taft, brought this civil rights action against individual correctional officials employed by the GEO Group, Inc. at Taft .[2]

---

[1] Plaintiff brings his civil rights action under <u>Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).   Plaintiff is no longer in custody.

[2] In the second amended complaint, Plaintiff indicates that Wackenhut Correctional Corporation is also known as the GEO Group, Inc.   Counsel for Defendants answered on behalf of Wackenhut Correctional Corporation, also known as the GEO Group, Inc. Wackenhut Corrections Corporation or WCC changed its corporate name to The GEO Group, Inc. (GEO) in 2003 after it became a fully independent company.

Plaintiff sets forth state law tort claims against the individual defendants as well as claims against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).   Plaintiff names the following individual defendants: Warden Raymond Andrews; Assistant Warden Terry Craig; Jonathan E. Akanno, M.D.; Margaret Minecci, R.N.; Lieutenant Thea Bucholz; Nurse Practitioner Susan Snellen; Nurse Esteban Noriega; Licensed Vocational Nurse Geraldine Nichols; Harley Lappin, Director of the U.S. Bureau of Prisons (BOP); Newton Kindig, Director of Medicine for the BOP; Mary Ellen Thomas, Assistant Medical Director of the BOP; Zachary Currier, BOP Oversight Specialist.  Plaintiff alleges that he contracted valley fever while at TCI. Plaintiff alleges that Defendants knowingly exposed him to the fungus that causes valley fever, initially failed to properly diagnose Plaintiff, and failed to provide Plaintiff with adequate medical care.   Plaintiff further alleges that while in administrative detention with his body covered in boils and lesions, Plaintiff was denied a bed and blankets.

On July 7, 2008, an order was entered by the District Court, adopting the findings and recommendations of the Magistrate Judge and ruling that this action proceeds as follows:

1. Against the United States on the FTCA claims, on the allegation that United States' employees transferred Plaintiff to a facility that was constructed by the United States with knowledge that the soil upon which it was built was contaminated with fungal spores that are known to cause Valley Fever;

2. Against BOP employees for violation of Plaintiff's rights under the Eighth Amendment;

3. Against  Taft employees for violation of Plaintiff's rights under the Eighth Amendment.

Defendants filed a motion to dismiss on December 8, 2008.   On September 17, 2009, an order was entered by the District Court, granting a motion to dismiss Plaintiff's FTCA claims

---

Evaluation of the Taft Demonstration Project: Performance of a Private-Sector Prison and the BOP (October 7, 2005), *available* at http://www.bop.gov/news/research_projects/published_reports/pub_vs_priv/orelappin2005.pdf. The Court will therefore refer to the company as GEO Group, Inc.

1   against the United States on the ground that Plaintiff failed to exhaust his remedies under the

2   FTCA.   The District Court also dismissed the individual federal Defendants' <u>Bivens</u> claims on

3   the ground that Plaintiff failed to exhaust his administrative remedies under the Prison Litigation

4   Reform Act (PLRA), 42 U.S.C. § 1997e(a).   The following defendants were dismissed: United

5   States; Zachary Currier; Harley Lappin; Newton Kindig; Mary Ellen Thomas.   This case

6   therefore now proceeds on the second amended complaint against Defendants Raymond

7   Andrews, Jonathan Akanno, Terry Craig, Margaret Minnecci, Estaban Noriega, Geraldine

8   Nichols, Thea Bucholz and Suzanne Snellen ("Taft employees")  for inadequate medical care

9   under the Eighth Amendment, and against the Taft employees, the GEO Group, Inc. and the Taft

10   Correctional Institution on  state law tort claims.  On December 20, 2010, the Taft employees and

11   GEO Group, Inc. filed the motion for summary judgment which is now before the Court.[3]

12 **II.     Summary of Complaint**

13       The events at issue in this action occurred at TCI while Plaintiff was incarcerated there.

14   Plaintiff alleges that Defendants knowingly exposed him to the fungus that is known to cause

15   valley fever by transferring him to TCI and then failed to properly diagnose and treat him for his

16   condition.

17       Plaintiff alleges that on December 8, 1999, he arrived at TCI.  Plaintiff alleges that San

18   Joaquin Valley soil is known to carry the coccidioidomycosis fungal spore, which causes valley

19   fever.  Plaintiff alleges that the Taft employees were responsible for Plaintiff's care, custody and

20   control while he was housed at TCI.  Plaintiff alleges that GEO Group and TCI have received

21   and reviewed grievances from several inmates complaining about inadequate medical treatment

22   for valley fever they contracted while housed at TCI since 1997.  Plaintiff alleges that GEO

23   Group and TCI requested and purchased grass to install at TCI in an effort to prevent sand storms

24   which cause valley fever spores to become airborne, but the request was denied by the BOP, so

25

26         [3] Defendant Taft Correctional Institution filed an answer, but did not participate in the motion for summary

27 judgment.

28                3

the measures were not taken.  Plaintiff alleges that by July 21, 2001, when he was diagnosed with valley fever, GEO Group and TCI failed to take reasonable measures to abate the substantial risk to inmates from contracting the disease.  Plaintiff alleges that GEO Group and TCI did not properly supervise the employees and medical staff at TCI.

Plaintiff alleges that on July 17, 2001, he reported to sick call complaining of headaches, shortness of breath, and night sweats.  An x-ray of his chest was taken and he was sent back to his unit.  On July 18, 2001, Dr. Akanno informed Plaintiff the x-rays revealed that his lungs were nearly filled to the top with something black.  Plaintiff alleges Dr. Akanno prescribed Biaxin and Hytuss and drew blood in order to test for valley fever and pneumonia.

On July 19, 2001, Dr. Akanno and Nurse Practitioner Snellen changed Plaintiff's medication to Erythromycin, an antibiotic.  Plaintiff alleges that when he asked if he had a bacterial infection, Dr. Akanno responded that he would not know until the blood test results were returned.

On July 20, 2001, Plaintiff saw Nurse Nichols at the pill window and complained to her about boils and lesions on his face and body, and told her he was spitting up blood.  Plaintiff alleges that Nichols told him to continue his medication and gargle with salt water, but he was not examined.  On July 25, 2001, Dr. Akanno, Nurse Minnecci and Nurse Snellen informed Plaintiff that the boils were an allergic reaction to the Erythromycin, but he was not examined and no one cancelled the medicine.  On July 26, 2001, Dr. Akanno again prescribed Biaxin, a medication for viral infections.  When Plaintiff asked Dr. Akanno if he had a viral infection, the doctor allegedly  became angry and threw him out.

On July 27, 2001, Plaintiff approached BOP Oversight Specialist Currier and asked him if it was possible to provide the proper medicine for a person if they had an infection in their lungs and it could be either viral, bacterial, or fungal, without results of a blood test.  Currier responded that it was not possible.  On the same date, Plaintiff was seen by Dr. Akanno, who advised Nurse Minnecci that Plaintiff was "cleared."  Plaintiff alleges that Nurse Minnecci then

ordered Lt. Bucholz to take Plaintiff to the Special Housing Unit (SHU) for punishment, for lying to his family and to Defendant Currier about his medical condition.  Plaintiff was then taken to the SHU.

Plaintiff alleges that Warden Andrews, Executive Assistant Craig, Dr. Akanno, Nurse Minnecci, Lt. Bucholz and Nurse Snellen wrote a false incident report stating that Plaintiff's medical file showed Dr. Akanno had diagnosed his illness and Plaintiff was given notification of it.  Plaintiff alleges he sent word to Currier about the false incident report, but Currier did not respond back.  Plaintiff alleges he received no treatment during the period of July 27 to July 30, 2001.  Plaintiff alleges that on July 30, 2001, the blood test results were returned from the lab and Dr. Akanno and Lt. Daughty informed him the result was positive for coccidioidomycosis, and not pneumonia, for which he was being treated.

Plaintiff alleges that he remained in the SHU sleeping on the floor without treatment, and Nurse Noriega, who dispensed medication in the SHU, did not give him any medication. Plaintiff alleges that Defendants Andrews, Kindig, Currier, Akanno and Minnecci delayed his blood test results, causing progression of his disease.

On August 3, 2001, Plaintiff was seen by Dr. Mui, an infectious disease specialist, who re-diagnosed Plaintiff with disseminated coccidioidomycosis.  Plaintiff alleges that Dr. Mui "stated the only reason Walker did not die was because the disease escaped through his skin which is very, very rare."  (Am. Compl. ¶ 38.)   Plaintiff alleges that as a result of Defendants' conduct, he now suffers from systematic coccidioidomycosis, affecting his blood, bones, lymph nodes and spine.  Plaintiff also alleges that has "has a hole and fracture" in his left clavicle, requiring surgery to remove a large portion of the clavicle joint and breast plate.  (Id. ¶ 43.)[4]

///

///

---

[4] There are no allegations in the second amended complaint that any of the defendants were presented with, or failed to treat Plaintiff for, the injury to his clavicle.

**III.    Summary Judgment**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [a]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson, 477 U.S. at 248; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Matsushita, 475 U.S. at 588; County of Tuolumne v. Sonora Community Hosp., 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see

6

1  whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P.

2  56(e) advisory committee's note on 1963 amendments).

3        In resolving the summary judgment motion, the court examines the pleadings,

4  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

5  any.  Rule 56(c).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at

6  255, and all reasonable inferences that may be drawn from the facts placed before the court must

7  be drawn in favor of the opposing party,  Matsushita, 475 U.S. at 587 (citing United States v.

8  Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).  Nevertheless, inferences are not drawn

9  out of the air, and it is the opposing party's obligation to produce a factual predicate from which

10  the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45

11  (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

12        Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

13  show that there is some metaphysical doubt as to the material facts.  Where the record taken as a

14  whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

15  issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

16  **IV.   Medical Care**

17        A prison official cannot be found liable under the Eighth Amendment for denying an

18  inmate humane conditions of confinement unless the official knows of and disregards an

19  excessive risk to inmate health and safety.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The

20  Court in Farmer adopted a subjective standard requiring an "inquiry into a prison official's state

21  of mind" when it is alleged that a prison official was deliberately indifferent to a substantial risk.

22  Id. at 838 (citing Wilson v. Seiter, 501 U.S. 294, 299 (1991)).  To satisfy this inquiry, "the

23  official must both be aware of facts from which the inference could be drawn that a substantial

24  risk of serious harm exists, and he must also draw the inference."  Id. at 837.  Alternatively, the

25  Court rejected any possibility that an official could be held liable for "a significant risk that he

26  should have perceived but did not."  Id.  Even if it is determined that the official was subjectively

27

28                                              7

1 | aware of a substantial risk, the official cannot be held liable if he acted reasonably in response to

2 | that risk, "even if the harm ultimately was not averted." Id. at 844.

3 |    In Estelle v. Gamble, 429 U.S. 97, 106 (1976), the Supreme Court held that inadequate

4 | medical care did not constitute cruel and unusual punishment cognizable under section 1983

5 | unless the mistreatment rose to the level of "deliberate indifference to serious medical needs."  In

6 | applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil

7 | rights have been abridged, "the indifference to his medical needs must be substantial.  Mere

8 | 'indifference,''negligence,' or 'medical malpractice' will not support this cause of action."

9 | Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle, 429 U.S. at

10 | 105-06.

11 | **A.    Defendants Andrews, Craig and Bucholz**

12 |    In the second amended complaint, Plaintiff alleges that on July 27, 2001, Andrews, along

13 | with Defendants Craig, Akanno, Minnecci, Bucholz and Snellen participated in a "false incident

14 | report."  (Am. Compl. ¶ 7.)  This incident report indicated that Plaintiff had been given

15 | notification of his diagnosis and that Dr. Akanno had diagnosed Plaintiff's illness.  Plaintiff was

16 | then placed in a two man cell which already had two inmates in it.  Plaintiff was forced to sleep

17 | on the floor.

18 |    Plaintiff also alleges that from July 27 to July 30, 2001, Andrews, along with Defendants

19 | Craig, Akanno, Minnecci, Snellen, Noriega and Bucholz, knowing of Plaintiff's diagnosis,

20 | "refused to provide him with any medicine or treatment for condition which caused his pain and

21 | suffering and intentional emotional distress.."  (Id. ¶ 34.)  Plaintiff alleges that Andrews, along

22 | with Defendants Craig, Minnecci, Snellen, Bucholz, Lappin, Kindig, Thomas and Currier "knew

23 | or should have known of Walker's diagnosed condition on 7/30/01, and treatment and medicine

24 | should have been provided to treat his confirmed diagnosis of valley fever, but yet he remained in

25 | the SHU sleeping on the floor as punishment, no medication, or treatment . . . .until August 3,

26 | 2001."  (Id. ¶ 37.)    Plaintiff alleges generally that Andrews failed to properly supervise

27 |

28 | <center>8</center>

employees and medical staff at Taft.   Plaintiff alleges that Andrews, along with Defendants United States, BOP, GEO Group, Inc., Taft, Lappin and Kindig "were final policy makers in care, custody and control of Walker's health and safety and allow untrained and unsupervised staff employees at WCC and Taft's Medical Department to abuse and violate his medical mistreatment under the Eight Amendment."  (Id. ¶ 42.)

Plaintiff alleges that Andrews, along with Defendants Kindig, Currier, Akanno and Minnecci, delayed his blood results, "causing progression of the disease past the lungs, based of their policy to obtain authorization from WCC headquarters in Florida and BOP's authorization from Washington, before Walker could be properly cared and treated by a specialist in this field and admitted into a hospital."  (Id. ¶ 49.)

In support of their motion, Defendants submit the declaration of Robert D. Jones, M.D. Dr. Jones is not a party to this action, and was retained as a consultant by Defendants.  Regarding his qualifications, Dr. Jones declares the following:

> My opinions are based upon my knowledge and training as a medical doctor (since 1974), combined with extensive correctional health experience in jails, prisons and juvenile correctional facilities.  My experiences involve not only providing health services to inmates and detainees, but also in administration of correctional health care.   My knowledge on national standards and surveying of jails and prisons on their compliance with those standards further support my opinions.  I have spent most of my professional career serving as a physician in correctional facilities throughout Arizona and have successfully treated hundreds of valley fever cases.
>
> I currently serve as a member of the Medical Committee of the American Correctional Association (ACA).  In addition, I am a Certified Correctional Healthcare Provider of the National Commission on Correctional Health Care (NCCHC) and a past president of the American Correctional Health Services Association.  I have assisted with the revisions and drafting of health care standards by both the NCCHC and also those of the ACA.  I have served as the medical and mental health director for prison systems in Utah, Montana and Arizona.  My principal office is located on Phoenix, Arizona.
>
> I reviewed the following documents and material in forming the

opinions expressed herein:
    (a)    Plaintiff's Second Amended Complaint with exhibits;
    (b)    Plaintiff's deposition transcript with exhibits; and
    (c)    Medical records from Taft Correctional Institution.

(Jones Decl. ¶¶ 3-5.)

Regarding Defendants Andrews, Craig and Bucholz, Dr. Jones declares that "I could find no reference in the medical records where Warden Raymond Andrews, Lt. Terry Craig, or Lt. Theresa Bucholz provided medical care to Mr. Walker or interfered with his medical care." (Id. ¶ 59.)   Plaintiff offers no evidence in opposition.  Plaintiff's opposition consists of 6 pages of argument.  Plaintiff does not, however, submit any evidence in support of his opposition.  The second amended complaint  on which this action is proceeds, is made under the penalty of perjury and will therefore be considered as a declaration in opposition to the motion.[5]

Plaintiff's complaint, taken as a declaration, indicates generally that Defendants Andrews, Craig and Bucholz "knew or should have known" of Plaintiff's condition, and treatment should have been provided.  Although Plaintiff declares generally that these Defendants delayed his blood results, he does not specifically indicate how they did so.  Federal Rule of Civil Procedure 56(c)(4) requires that affidavits be made on personal knowledge, set forth facts that would be admissible in evidence (i.e., no inadmissible hearsay or opinions), and that show the affiant is competent to testify to the matters stated.   Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (209), citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "Plaintiff must set forth sufficient factual matter accepted as true, to 'state a claim that is plausible on its face.'"  Iqbal, 129 S.Ct. at 1949, quoting Twombly, 550 U.S. at 555.  While factual allegations are accepted as true, legal conclusions are

---

[5] A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e).

1   not. Iqbal, 129 S.Ct. at 1949.

2          Defendants have come forward with evidence that Defendants Andrews, Craig and

3   Bucholz were not involved in Plaintiff's medical care.  Although Plaintiff declares generally that

4   they interfered with his health care and that they should have known of his condition, he fails to

5   come forward with any evidence that any of these Defendants knew of and disregarded Plaintiff's

6   medical condition.  "[T]o the extent that Plaintiff is attempting to pursue an Eighth Amendment

7   claim for the mere fact that he was confined in a location where Valley Fever spores existed

8   which caused him to contract Valley Fever, he is advised that no courts have held that exposure

9   to Valley Fever spores presents an excessive risk to inmate health." King v. Avenal State Prison,

10  2009 WL 546212, *4 (E.D. Cal., Mar 4, 2009); see also Tholmer v. Yates, 2009 WL 174162, *3

11  (E.D. Cal. Jan. 26, 2009)("To the extent Plaintiff seeks to raise an Eighth Amendment challenge

12  to the general conditions of confinement at PVSP, Plaintiff fails to come forward with evidence

13  that Yates is responsible for the conditions of which Plaintiff complaints.").  Defendants

14  Andrews, Craig and Bucholz cannot, therefore, be held liable for the failure to supervise their

15  subordinates, subjecting Plaintiff to dangerous conditions, or for a failure to protect Plaintiff.

16  Judgment should therefore be entered for Defendants Andrews, Craig and Bucholz on Plaintiff's

17  Eighth Amendment claim.[6]

18          **B.    Defendant Akanno**

19          Plaintiff alleges that on July 18, 2001, Defendant Jonathan Akanno, M.D. informed

20  Plaintiff that x-rays revealed that his lungs were filled "with something black." (Am. Compl. ¶

21  26.)  Akanno wrote a prescription for Biaxin and Hytuss, and ordered a blood test for valley

22  fever. Plaintiff alleges that the medication was unavailable to him at pill call on July 18 and 19,

23  2001.  (Id.)  On July 19, Akanno issued a prescription for Erythromycin, which was in stock.

24  Walker asked if he had a bacterial infection.  Akanno replied that he would not know until the

25

26          [6] Plaintiff's allegation that he slept on the floor, of itself, fails to state a claim for and Eighth Amendment
    violation.  There are no allegations that any of the defendants subjected Plaintiff to conditions of confinement such
27  that it constituted deliberate indifference.  Foster v. Runnels, 554 F.3d 807 (9th Cir. 2009).

28                                          11

blood test came back.  (Id. ¶ 27.)

On July 25, 2001, Dr. Akanno informed Plaintiff that the boils that he complained of on July 20th were a result of the Erythromycin.   Although Plaintiff alleges that no one cancelled the prescription when he went to pill line later that same day, he also alleges that the next day, Dr. Akanno prescribed the Biaxin that he originally prescribed.  Plaintiff contends that Biaxin is "an antibiotic for a viral infection," and asked Dr. Akanno if he had a viral infection.  Dr. Akanno "became very angry and threw him out."  (Id. ¶ 30.)

On July 27, 2001, Plaintiff was seen at the medical clinic for boils.  Dr. Akanno advised Defendant Minnecci that Plaintiff was cleared.   Plaintiff alleges that from July 27 to July 30, 2001, Dr. Akanno refused to provide Plaintiff with any treatment or medicine for his condition. (Id. ¶ 35.)   On July 30, 2001, the blood test was returned from the laboratory, indicating that Plaintiff was positive for valley fever.  Dr. Akanno advised Plaintiff that he had valley fever and not pneumonia. (Id.)

Regarding Dr. Akanno's treatment of Plaintiff's condition, Dr. Jones declares the following:

> According to the medical records, Dr. Jonathan Akanno examined Mr. Walker on July 18, 2001.  Dr. Akanno prescribed Clarithromycin (Biaxin).  He also prescribed Hytuss, a medication used to treat chest congestion.  He approved of Nurse Murch's assessment and plan, including the request for a check for coccidioidomycosis.
>
> Coccidioidomycosis ("valley fever") is a fungal infection caused by cocciodes organisms.  It can cause fever, chest pain and coughing, among other signs and symptoms.  The coccidiodes species of fungi that cause valley fever are commonly found in the soil in certain areas.  The fungi that cause valley fever are commonly found in the soil in certain areas.  The fungi that cause coccidioidomycosis thrive in the alkaline desert soils of southern Arizona, Nevada, northern Mexico and California's San Joaquin Valley.
>
> The coccidiodes fungi can be stirred into the air by anything that disrupts the soil, such as farming, construction and wind.  The fungi can then be breathed into the lungs and cause coccidioidomycosis.

Like many other fungi, coccidiodes species have a complex life cycle. In the soil, they grow as a mold with long filaments that break off into airborne spores when the soil is disturbed. The spores are extremely small, can be carried hundreds of miles by the wind and are highly contagious. Once inside the lungs, the spores reproduce, perpetuating the cycle of the disease. Anyone who inhales the spores that cause valley fever is at risk of infection. Up to half the people living in areas where valley fever is common are infected.

Mild cases of valley fever usually go away on their own. In more severe cases of valley fever, physicians typically prescribe antifungal medications that can treat the underlying infection. This initial illness can develop into a more serious disease, including chronic and disseminated coccidioidomycosis.

The initial, acute form of Coccidioidomycosis is often mild, with few, if any, symptoms. When signs and symptoms do occur, they appear about three weeks after exposure. They tend to resemble those of the flu, and can range from minor to severe: Fever, cough, chest pain, chills, night sweats, headache, fatigue, shortness of breath, joint aches, and/or a red, spotty, rash.

The rash that sometimes accompanies valley fever is made up of red bumps that later may turn brown. The rash mainly appears on the patient's lower legs, but sometimes on the chest, arms and back. Some people with valley fever have raised a red rash with blisters or eruptions that look like pimples.

Most people with acute valley fever do not require medical treatment. Even when symptoms are severe, the best therapy for otherwise healthy adults is often bed rest and fluids – the same approach used for colds and flu. Still, physicians must monitor people with valley fever. If symptoms do not improve or become worse or if the patient is at increased risk of complications because of a compromised immune system, a physician may prescribe an antifungal medication. Antifungal medications are also used for high-risk people or for those with chronic or disseminated versions of the disease.

In general, the antifungal drugs are used for all but the most serious forms of coccidioidomycosis disease. All antifungals can have serious side effects. These side effects, however, usually go away once the medication is stopped. The most common side effects of antifungal drugs are nausea, vomiting, abdominal pain and diarrhea. Some levels of infection are treated initially with an intravenous antifungal medication.

These medications control the fungus, but sometimes don't destroy it, and relapses may occur. For many people, a single bout of valley fever results in lifelong immunity, but the disease can be reactivated, or the patient can be reinfected if his or her immune

system is significantly weakened.

If a patient does not become ill from valley fever, infection can only be identified by a positive blood test.  If a patient develops symptoms, especially severe ones, the course of the disease is highly variable.  It can take from six months to a year to fully recover, and fatigue and joint aches can last even longer.   The severity of the disease depends on several factors, including the patient's overall health and the number of fungus spores inhaled.

If the initial coccidioidomycosis infection doesn't completely resolve, it may progress to a chronic form of pneumonia.  This complication is most common in people with diabetes or weakened immune symptoms.  Patients with unresolved infections are likely to have periods of worsening symptoms alternating with periods of recovery.  Signs and symptoms are similar to those of tuberculosis: low-grade fever, weight loss, cough, chest pain, blood-tinges sputum, and nodules in the lungs.

Disseminated coccidioidomycosis occurs when the infection spreads (disseminates) beyond the lungs to other parts of the body.  Most often these parts include the skin, bones, liver, brain, heart, and the membranes that protect the brain and spinal cord (meninges).  The signs and symptoms of disseminated disease depend on which parts of the patient's body is affected and may include: nodules, ulcers and skin lesions, lesions in the skull, spine or other bones, painful, swollen joints, especially in the knees or ankles, and meningitis - an infection of the membranes and fluid surrounding the brain and spinal cord.  It takes weeks to months after initial infection for the disease to disseminate.  Dissemination is not a rapid process.

On July 19, 2001, Dr. Akanno noted in Mr. Walker's chart that Biaxin was presently unavailable.  He changed Mr. Walker's antibiotic medication to 500 mg. of Erythromycin for 14 days.  He also noted in the chart his request to be informed when Biaxin again became available for a "possible switch" of medication.

On July 20, 2001, at 9:00 a.m., in response to the request for a check of Mr. Walker for valley fever, Vanessa Salazar drew Mr. Walker's blood for a lab test.   The lab completed its analysis of Mr. Walker's blood sample and confirmed recent exposure to the coccidiodes species of fungi that causes valley fever.  Mr. Walker's coccidioidomycosis titer count was 1:64.  Titers are a measurement of the quantity of a particular antibody circulating in the bloodstream.  Titers are usually expressed in a ratio that represents how many times the blood can be diluted until no antibodies are found.  For example, if someone's blood is diluted a thousand times, the point at which no antibodies to the particular antigen are found, then the titer count would be expressed as 1:1000.  A titer count of 1:64 means a fairly recent exposure and served as a base line number for Mr. Walker.  The community standard of care

14

would require the taking of another titer count within two to four weeks as the titer count does not change within hours, but rather only changes over weeks and months. A higher titer count weeks later, such as 1:128, 1:256 or 1:512, would be a clinical indication of the need for a consult with an infectious disease specialist. Dr. Akanno indicated receipt of these lab results on July 30, 2001 in Mr. Walker's chart. The chart also shows that Dr. Akanno first contacted an infectious disease specialist by the name of Dr. Amin on August 1, 2001. This is a very quick diagnostic course of treatment. Dr. Akanno promptly seeking an outpatient consult for Mr. Walker from an infectious disease specialist with a patient with such a low titer count exceeds national standards and practices within the general community and within correctional facilities.

In paragraph 27 of the Second Amended Complaint, Mr. Walker claims that the blood test should have been "stat" (urgent) because of the seriousness of his condition and that the failure to request "stat" lab work caused his condition to worsen. It is not uncommon for labs to take a week or more to return lab results to a physician when those results are not ordered on an urgent or rush basis. After a careful review of the medical records showing Mr. Walker's symptoms, it is my opinion that there was no medical reason for lab work on a rush basis. There is, likewise, no indication that anyone intentionally or unintentionally delayed Mr. Walker's blood test results. As dissemination of this infection is not a rapid process, any alleged delay (the 10 day time period between blood draw and return of the lab results) would have had no impact on Mr. Walker's medical condition. My opinion, in part, rests on the fact that Mr. Walker later (on August 3, 2001) had a whole body bone scan upon admission to San Joaquin Community Hospital with normal results, showing that the coccidioidomycosis had not spread to his bones. Mr. Walker's claim that the delay caused his disease to progress resulting in the conditions and symptoms that he describes in paragraphs 43, 55 and 56 of his Second Amended Complaint is not supported by medical science.

Nurse Snellen examined plaintiff on July 26, 2001 for follow up on his previous diagnosis of atypical pneumonia. Plaintiff reported that he still felt "bad' and that he was not better. She noted that he was alert, not in distress, and had "minimal cough present, although he (Mr. Walker) feels as if he needs to expectorate." On this same day, Dr. Akanno initiated a "stat" order for Biaxin to be received from a local K-Mart pharmacy so that plaintiff would not need to take Erythromycin.

Dr. Akanno next examined plaintiff on July 27, 2001 to medically clear him to be housed in a special housing unit. Dr. Akanno determined that Mr. Walker was medically stable and could have his housing reassigned. He also noted in the medical chart that Mr. Walker had "atypical pneumonia, improving" and that he would

15

follow up with his patient.

Plaintiff claims that he did not get any prescribed medication while he was housed in the special housing unit between July 27, 2001 and August 3, 2001.  Even if true, the failure to deliver Biaxin or Erythromycin (the only medication prescribed to him at that time according to the medical chart) would have had no actual impact on his medical condition as those medications are not used to treat coccidioidomycosis.

Dr. Akanno notified Mr. Walker of his confirmed case of coccidioidomycosis during his examination on July 30, 2001 at 3:10 p.m.  He noted in his chart note for that examination that he would set up an evaluation with Dr. Amin, an infectious disease specialist.  He also noted that liver function tests done previously were abnormal and that hepatitis serologies were still pending.

There is no reference in the medical chart about approval being necessary to obtain a consultation from an infectious disease specialist, and it appears that any delay in locating the specialist was caused by the specialist's vacation schedule.  Mr. Walker's titer count showing a valley fever infection did not require a consult with an infectious disease specialist at that time (as will be discussed further in my "opinions" section below).

Dr. Akanno examined Mr. Walker again at 11:40 a.m. on August 1, 2001.  He noted that Mr. Walker had complained of being diaphoretic (experiencing excessive sweating), but denied fever, chills, shortness of breath or chest pain.  Dr. Akanno noted the following in his chart: "Dr. Amin's office states that he will be on vacation throughout this month: will find out who sees his patients."

Dr. Akanno saw Mr. Walker again on August 2, 2001 at 11:10 a.m. and noted in his chart that efforts were being made for an infectious disease specialist to see the patient.

On August 3, 2001 at 12:00 a.m. medical assistant Nashira Hodge determined Mr. Walker was in stable condition and cleared him medically to be released to security for transportation to an outside hospital.

Dr. Mui, an infectious disease specialist, admitted Mr. Walker to San Joaquin Community Hospital on August 3, 2001.  That same day, Mr. Walker received a whole body bone scan which ruled out metastatic inflammatory bone lesions.  Mr. Walker's coccidioidomycosis had not spread to his bones.

Hospital staff provided plaintiff with Amphotericin B, an antifungal drug given intravenously for systemic fungal infections.  Amphotericin B is well-known for its severe and potentially lethal side effects.  Very often, a serious acute reaction after the infusion

16

(1 to 3 hours later) is noted, consisting of high fever, shaking chills, hyptension [sic], nausea, vomiting, headache and generalized weakness.  To decrease the likelihood and severity of the symptoms, initial doses should be low, and increased slowly.

After receiving initial infusions of Amphotericin B, Mr. Walker returned to the medical clinic at Taft Correctional Institution on August 20, 2001.  The discharge summary from San Joaquin Community Hospital medical staff noted that Mr. Walker's "course was an uncomplicated one" and that he tolerated the drug well.  Staff also indicated that Mr. Walker's bone scan was "completely negative" meaning the infection had not spread to his bones.

Mr. Walker continued to receive Amphotericin B infusions at Taft Correctional Institution and, according to facility medical records, he was carefully monitored for side effects during and after each infusion.  Dr. Akanno noted in the chart after each of his examinations of Mr. Walker that he was to be informed "if there is any concern while patient is being monitored" during and after the infusions.  He ordered Demerol for Mr. Walker if he developed shakes while on Amphotericin B, a medically acceptable measure to treat the possible side effects.  According to the records, Mr. Walker tolerated each infusion well.

On August 20, 2001 at 6:15 p.m., Esteban Noriega, L.V.N. admitted Mr. Walker to the infirmary.  He noted "many scattered nodules on face and back, probably from disseminated coccidioidomycosis."  He also noted that the patient's lungs were clear and that the patient reported an occasional dry cough.  Dr. Akanno and Nurse Snellen both approved of Nurse Noriega's plan to include doses of Amphotericin B on Mondays, Wednesday and Fridays as well as weekly lab tests.  Dr. Akanno prescribed the Amphotericin B on August 21, 2001 at 9:30 a.m.

The medical records from Taft Correctional Institution indicate that Mr. Walker remained in the clinic until he was transferred to another prison on or about October 9, 2001.  Mr. Walker received regular medical care during this time period, often being examined and evaluated two or three times per day.  Dr. Akanno ordered and evaluated frequent lab results and ordered follow-up x-ray of Mr. Walker's chest on August 30, 2001, care that was well within community medical standards.

By August 23, 2001, Plaintiff reported "feeling fine" to Dr. Akanno and denied shortness of breath, chest pain, nausea or vomiting.

According to the medical records, plaintiff began asking to leave the medical clinic on August 28, 2001.  He continued to ask at various times during the remainder of his stay, while reporting that he was feeling better.

17

On October 9, 2001, Dr. Akanno examined plaintiff for the last time. He noted that Mr. Walker's coccidioidomycosis titer count was still "reasonably high" and found that he was medically stable to be transferred to the Federal Medical Center at Fort Worth, Texas for further medical treatment.

(Jones Decl. ¶¶ 3-41.)

Dr. Jones summarizes Plaintiff's entire course of care at Taft, specifically including

Defendants' conduct, as follows:

In my professional opinion, all of the medical care provided to Mr. Walker while in custody is consistent with national standards and practices within the general community and within correctional facilities. There is nothing in the records to suggest any denial or delay of medically necessary care or treatment, and the care provided was timely and appropriate. There was no delay in diagnosis or treatment. Rather, the Taft Correctional Institution's medical staff - including all of the named defendants - provided a quick course of treatment. I found no evidence of medical malpractice by any of the defendants or any other employee of Taft Correctional Institution. The records firmly reflect that Mr. Walker received the appropriate eradication protocol for his infection, as discussed in detail above.

It is also my professional opinion that nothing exists in the documents I reviewed to suggest that any employee of Taft Correctional Institution, including Dr. Jonathan Akanno, Nurse Margaret Minnecci, Nurse Esteban Noriega, Nurse Geraldine Nichols, Nurse Practitioner Suzanne Snellen, Warden Raymond Andrews, Lt. Terry Craig, and/or Lt. Thea Bucholz were deliberately indifferent to Mr. Walker's health care needs.

Mr. Walker was provided timely and appropriate care and appropriately examined by Dr. Akanno, Nurse Minnecci, Nurse Nichols, and Nurse Practitioner Snellen on all occasions.

I could find no reference in the medical records where Warden Raymond Andrews, Lt. Terry Craig, or Lt. Thea Bucholz provided medical care to Mr. Walker or interfered with his medical care.

(Jones Decl. ¶¶ 56-59.)

Dr. Jones' declaration clearly establishes that Dr. Akanno responded to Plaintiff's

medical condition. Specifically, Dr. Jones' declaration establishes that between July 18, 2001,

and October 9, 2001, when Plaintiff was transferred for further medical care, he was seen

18

1    approximately 11 times.   Plaintiff's allegations indicate that he disagrees with the course of

2    treatment provided by Dr. Akanno.   Plaintiff cannot prevail in a section 1983 action where only

3    the quality of treatment is subject to dispute.  Sanchez v. Vild, 891 F.2d  240 (9th Cir. 1989).

4    Mere difference of opinion between a prisoner and prison medical staff as to appropriate medical

5    care does not give rise to a section 1983 claim. Hatton v. Arpaio, 217 F.3d 845 (9th Cir. 2000);

6    Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

7          The only allegations that could be construed as deliberate indifference on Dr. Akanno's

8    part are that on July 25, 2001, Dr. Akanno informed Plaintiff that the boils were an allergic

9    reaction to the Erythromycin, but Plaintiff "was not examined and no one cancelled the

10   medicine." (Am. Compl. ¶ 29.)   Plaintiff also alleges that from July 27to July 30, Dr. Akanno

11   knew of Plaintiff's diagnosis, yet "refused to provide him with any medicine or treatment for

12   condition." (Am. Compl. ¶ 34.)

13         As to Plaintiff's allegation regarding July 25, 2001, Dr. Jones declares that Plaintiff was

14   seen the next day, July 26th, and was examined by Nurse Snellen.   Plaintiff reported that he still

15   felt "bad" and that he was not better.  Nurse Snellen noted that Plaintiff was alert, not in distress,

16   and had a minimal cough. That same day, Dr. Akanno initiated a stat order for the Biaxin from a

17   local pharmacy.   Plaintiff was seen by Dr. Akanno on July 27th and was cleared for placement in

18   a special housing unit.  (Jones decl. ¶¶ 26, 27.)

19         Regarding Plaintiff's claims that he did not get any prescribed medication while he was

20   housed in the special housing unit, Dr. Jones' declaration establishes that the failure to deliver

21   the Biaxin or Erythromycin (the only medication prescribed to him at the time according to the

22   medical chart) would have had no actual impact on his medical condition as those medications

23   are not used to treat coccidioidomycosis.  (Jones decl. ¶ 28.)

24         The gravamen of Plaintiff's allegations against Dr. Akanno is that he did not get the

25   quality of care that he believes he should have received, and that Dr. Akanno failed to

26   immediately diagnose and treat Plaintiff's condition.  Dr. Jones' declaration establishes that the

27

28                                                19

initial form of valley fever is often mild, with very few symptoms.  Symptoms tend to resemble the flu.  Even when symptoms are severe, Dr. Jones declares, the best therapy for otherwise healthy adults is often bed rest and fluids.  Plaintiff, in keeping with standards of medical care, was treated for flu, monitored, and when lab tests indicated the presence of valley fever, was treated appropriately.

That Plaintiff had a reaction to Erythromycin does not, of itself, subject Dr. Akanno to liability.  As noted above, Dr. Akanno's liability turns on subjective intent - whether he was deliberately indifferent to Plaintiff's condition.  Dr. Jones' declaration establishes that Dr. Akanno adjusted the treatment regiment as soon as he was aware of the reaction.   The evidence submitted by Dr. Akanno, establishes, without dispute, that he responded appropriately to Plaintiff's condition.  Plaintiff's evidence, establishes, at most, a disagreement with the quality of his care.  Plaintiff cannot prevail in a section 1983 action where only the quality of treatment is subject to dispute.  Sanchez v. Vild, 891 F.2d  240 (9th Cir. 1989).  Mere difference of opinion between a prisoner and prison medical staff as to appropriate medical care does not give rise to a section 1983 claim. Hatton v. Arpaio, 217 F.3d 845 (9th Cir. 2000);  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  Dr. Akanno is therefore entitled to summary judgment in his favor.

## C.   **Defendant Minnecci**

Plaintiff alleges that Defendant Minnecci, along with Defendants Akanno and Snellen informed him on July 25th that his boils were an allergic reaction the Erythromycin, and that nobody "cancelled the medicine." (Am. Compl. ¶ 29.)   Plaintiff alleges that on July 27, 2001, Minnecci, along with Defendants Akanno and Bucholz, examined Plaintiff and cleared him for housing in the special housing unit. (Am. Compl. ¶ 32.) Minnecci participated in a "false incident report." Plaintiff was placed in a 2 man cell that was already occupied by 2 inmates.  Plaintiff was forced to sleep on the floor.  (Am. Comp. ¶ 33.)   Minnecci allegedly refused to provide Plaintiff with medicine or treatment from July 27 to July 30, 2001.  (Am. Compl. ¶ 34.)  Plaintiff alleges that Minnecci should have known of Plaintiff's diagnosis on July 30, 2001, yet Plaintiff "remained in the SHU sleeping

20

on the floor as punishment, no medication, or treatment provided by Noriega the nurse dispensing the medication in the SHU for an additional four days until August 3, 2001." (Am. Compl. ¶ 37). Finally, Plaintiff alleges that Minnecci, along with Dr. Akanno, as supervisory officials failed to supervise Defendants Snellen, Nichols and Noriega.  Specifically, Plaintiff alleges that because "several other inmates prior to Walker" had contracted valley fever while housed at Taft between 1997 and 2001, Defendant Minnecci had a "culpable state of mind." (Am. Compl. ¶ 40.)

Dr. Jones' declaration establishes that on July 26, 2001,  Plaintiff's chart noted that he was not in distress, although he had a minimal cough present.  A stat order for Biaxin was ordered, so that Plaintiff would not need to take the Erythromycin.  Defendant's evidence indicates that, once Plaintiff's reaction to Erythromycin was noted, another medication was ordered. (Jones Decl. ¶ 26.) Plaintiff offers no evidence that Defendant Minnecci in any way disregarded a serious risk to Plaintiff's health.  In response to Plaintiff's allegation that he did not receive any medication between July 27 and 30, 2001, Dr. Jones declared that "even if true, the failure to deliver the Biaxin or Erythromycin (the only medication prescribed to him at that time according to the medical chart) would have had no actual impact on his medical condition as those medications are not used to treat coccidioidomycosis." (Jones Decl. ¶ 28.)

Dr. Jones' declaration clearly establishes that Plaintiff's condition was addressed.  Plaintiff offers no evidence that Defendant Minnecci knew of and disregarded Plaintiff's medical condition. Plaintiff's central claim is that Minnecci, along with the other defendants, should have known that Plaintiff had valley fever.  As noted, the courts of this district have found such claims to be insufficient.  Defendant Minnecci  cannot, therefore, be held liable for the failure to supervise her subordinates, subjecting Plaintiff to dangerous conditions, or for a failure to protect Plaintiff. Judgment should therefore be entered for Defendant Minnecci.

///

///

///

21

1    **D.    Defendant Noriega**

2             Plaintiff alleges that Noriega, along with Minnecci, refused to provide Plaintiff with

3    medicine or treatment from July 27 to July 30, 2001.  (Am. Compl. ¶ 34.)  Plaintiff also alleges that

4    Noriega should have known of Plaintiff's diagnosis on July 30, 2001, yet Plaintiff "remained in the

5    SHU sleeping on the floor as punishment, no medication, or treatment provided by Noriega the nurse

6    dispensing the medication in the SHU for an additional four days until August 3, 2001."  (Am.

7    Compl. ¶ 37).   As noted above, Dr. Jones' declaration establishes that Plaintiff received adequate

8    medical care.  Dr. Jones' declaration establishes that Plaintiff was not prescribed any medicine for

9    valley fever during the time period July 27to July 30, 2001.  That Plaintiff was in SHU, and did not

10   receive medication for three days does not, of itself, constitute deliberate indifference.  Defendants'

11   evidence clearly establishes that no defendant, including Noriega, willingly or knowingly deprived

12   Plaintiff of any treatment or medication that was prescribed for valley fever.   Plaintiff has not

13   provided any evidence to the contrary.  Judgment should therefore be entered in favor of Defendant

14   Noriega.

15   **E.    Defendant Nichols**

16           Plaintiff alleges that Defendant Nichols saw him at the pill window on July 20, 2001.

17   Plaintiff complained of boils and lesions over his face and body and spitting up blood.  Plaintiff

18   alleges that he was not examined and that he was told by Nichols "to go and gargle with 'salt water'

19   for the spitting up of blood and that his condition should improve once the medicine took effect."

20   (Am. Compl. ¶ 28.)  Plaintiff alleges generally that Nichols should have known that Plaintiff had

21   coccidioidomycosis, based on the history of other inmates that have contracted valley fever.  Plaintiff

22   alleges that all efforts "have failed to bring it into remission."  (Am. Compl. ¶¶ 40, 51.)

23           Dr. Jones' declaration establishes that on July 20, 2001, in response to Plaintiff's request to

24   check to see if he had valley fever, blood was drawn.  The result indicated that Plaintiff's titer count

25   was 1:64, which meant a fairly recent exposure.  Dr. Jones further declared that the community

26   standard of care would require the taking of another titer count within two to four weeks, as the titer

27

28                                                    22

count does not change within hours, but rather only changes over weeks and months. (Jones Decl. ¶ 24.) Although the test results were not known for ten days, Dr. Jones' declaration establishes that as dissemination of this infection is not a rapid process, any alleged delay (the 10 day time period between blood draw and return of the lab results) would have had no impact on Plaintiff's condition. Dr. Jones further declared that his opinion rested, in part, on the fact that on August 3, 2001, Plaintiff had a whole body scan upon admission to San Joaquin Community Hospital with normal results, showing that the coccidioidomycosis had not spread to his bones. (Jones Decl. ¶ 25.)

Defendants have come forward with evidence that Defendant nurse Nichols did not know and disregard a serious risk to Plaintiff's health. Plaintiff's allegations, taken as a declaration, establish that Nichols failed to physically examine Plaintiff. Such a declaration, with nothing more, fails to state a claim for relief. Blood was drawn in order to determine whether Plaintiff had valley fever, and the ten day delay in receiving the results did not cause Plaintiff any harm. Dr. Jones' declaration establishes that the titer level indicated a fairly recent exposure to valley fever. As with the other defendants, the crux of Plaintiff's claim is that he contracted valley fever, and Nichols, along with the other defendants, should have known that Plaintiff had valley fever earlier than they did. As noted, however, no courts have held that exposure to valley fever spores presents an excessive risk to inmate health. Plaintiff can only hold defendants liable if they were deliberately indifferent to a serious medical need. Plaintiff offers no evidence that Defendant Nichols was deliberately indifferent to Plaintiff's serious medical need. Dr. Jones' declaration establishes that Plaintiff's level of care was within community standards. The motion for summary judgment should therefore be granted as to Defendant Nichols.

## F.   **Defendant Snellen**

Plaintiff alleges that Defendant Nurse Snellen changed his medicine to Erythromycin on July 19, 2001. (Am. Comp. ¶ 27.) Plaintiff alleges, as he did with Defendant Minnecci, that Nurse Snellen informed him on July 25th that his boils were an allergic reaction to the Erythromycin, and that nobody "cancelled the medicine." (Am. Compl. ¶ 29.) Plaintiff alleges that Snellen

23

participated in a "false incident report," and that Plaintiff was placed in a two man cell that was already occupied by two inmates.  Plaintiff was forced to sleep on the floor.  (Am. Compl. ¶ 33.)  Snellen allegedly refused to provide Plaintiff with medicine or treatment from July 27 to July 30, 2001.  (Am. Compl. ¶ 34.)

Plaintiff alleges that Snellen should have known of Plaintiff's diagnosis on July 30, 2001, yet Plaintiff "remained in the SHU sleeping on the floor as punishment, no medication, or treatment provided by Noriega the nurse dispensing the medication in the SHU for an additional four days until August 3, 2001."  (Am. Compl. ¶ 37.)   Plaintiff alleges generally that Snellen should have known that Plaintiff had coccidioidomycosis, based on the history of other inmates that have contracted valley fever.  Plaintiff alleges that all efforts "have failed to bring it into remission."  (Am. Compl. ¶¶ 40, 51.)

As with Defendant Minnecci, Dr. Jones' declaration clearly establishes that Plaintiff's condition was addressed.  Plaintiff offers no evidence that Defendant Snellen knew of and disregarded Plaintiff's medical condition.  Plaintiff's central claim is that Snellen, along with the other defendants, should have known that Plaintiff had valley fever.  The courts of this district have found such claims to be insufficient.  Judgment should therefore be entered in favor of Defendant Snellen.

## V.   State Law Claims

This action proceeds on the second amended complaint against the Taft Employees, the Geo Group, Inc.  and Taft Correctional Institution on Plaintiff's state law tort claims.

In a medical malpractice action, the plaintiff must establish: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." Tortorella v. Castro, 140 Cal.App.4th 1, 3 n.2 (2006); Hanson v. Grode, 76 Cal.App.4th 601, 606 (1999).  "The standard of care in a medical malpractice case requires that medical service providers

1   exercise that . . . degree of skill, knowledge and care ordinarily possessed and exercised by members

2   of their profession under similar circumstances." Barris v. County of Los Angeles, 20 Cal.4th 101,

3   108 (Cal. 1999); Landeros v. Flood, 17 Cal.3d.399, 408 (1976).  "Because the standard of care in

4   a medical malpractice case is a matter 'peculiarly within the knowledge of experts,' expert testimony

5   is required to prove or disprove that the defendant performed in accordance with the standard

6   prevailing of care unless the negligence is obvious to a layperson." Johnson v. Superior Court, 143

7   Cal.App.4th 297, 305 (2006); see Flowers v. Torrance Mem'l Hosp. Medical Ctr., 8 Cal.4th 992,

8   1001 (Cal. 1994); Landeros, 17 Cal.3d at 410.  When a defendant supports a motion for summary

9   judgment with expert testimony that his conduct fell within the community standard of care, the

10  failure of a plaintiff to present conflicting expert opinion is fatal to the plaintiff's medical

11  malpractice claim.  See Hutchinson v. United States, 838 F.2d 390, 392-93 (9th Cir. 1988); Hanson,

12  76 Cal.App.4th at 607; Jambazian v. Borden, 25 Cal.App.4th 836, 844 (1994); Willard v.

13  Hagemeister, 121 Cal.App.3d 406, 412 (1981).

14      Defendants argue that it is undisputed that all of Defendants' treatment of Plaintiff has met

15  the appropriate standard of care.  Dr. Akanno's prompt diagnosis of valley fever on July 30, 2001

16  and his prompt contacting of an infectious disease specialist for a outpatient consult exceeded

17  national standards and practices within the general community and within correctional facilities.

18      Dr. Jones' declaration establishes that the prescription of Biaxin and/or Erythromycin, and

19  the administration of these drugs as a precautionary measure, at the times during which they were

20  given to Plaintiff, were within community standards and are the accepted medical therapy for

21  atypical pneumonia.  These medications became unnecessary once the valley fever diagnosis was

22  made as they are not used to treat valley fever.  (Jones Decl. ¶ 54.)    The prescription of

23  Amphotericin B, and the administration of this drug at the times during which it was given to

24  Plaintiff, were within the medical community standards as this drug remains the accepted medical

25  therapy for disseminated coccidioidomycosis.  (Jones Decl. ¶ 55.)

26      Regarding Plaintiff's care, Dr. Jones' declaration establishes that all of the medical care

28                                      25

provided to Plaintiff while in custody was consistent with national standards and practices within the general community and within correctional facilities. (Jones Decl. ¶ 56.) There is nothing in the records to suggest any denial or delay of medically necessary care or treatment, and the care provided was timely and appropriated. Id. There was no delay in diagnosis or treatment. Id. The medical records reflect that Plaintiff received the appropriate eradication protocol for his infection. (Jones Decl. ¶ 53.) Plaintiff was provided timely and appropriate care and appropriately examined by Dr. Akanno, Nurse Minneci, Nurse Noriega, Nurse Nichols and Nurse Practitioner Snellen on all occasions. (Jones Decl. ¶ 58.)

The Court finds that Defendants have met their burden on summary judgment as to this claim. Dr. Jones' declaration establishes that Defendant's exercised that degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances." Barris , 20 Cal. 4th at 108.

Plaintiff's opposition consists of 6 pages of legal argument. Plaintiff fails to submit any exhibits or evidence in support of his opposition. Plaintiff's second amended complaint, treated as an affidavit, establishes, at most, a disagreement with his treatment. Plaintiff is clearly unhappy with the course of his treatment, and the perceived delay. Defendants' evidence, however, clearly establishes, without dispute, that Plaintiff's treatment was medically appropriate and timely.

## VI.   **Taft Correctional Institution**

Defendant Taft Correctional Institution (TCI) filed an answer, but did not participate in the motion for summary judgment. The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1),(2). "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action or appeal . . .

fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

In the second amended complaint, Plaintiff appears to make no distinction between Defendants TCI and Taft employees.  Plaintiff refers generally to "Taft."  The only allegations as to Taft, however, are that Taft knew or should have known of the danger to Plaintiff, that Taft allowed untrained and unsupervised staff to "abuse and violate" Plaintiff's medical treatment.   As noted in the above analysis, the individual defendants are entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim, and the Taft Employees and Geo Group, Inc.  are entitled to judgment on Plaintiff's state law claims.  The allegations in the second amended complaint as to TCI and Taft employees are vague.

Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions," none of which applies to § 1983 actions.  Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (512) (2002). Pursuant to Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . ." Fed. R. Civ. P. 8(a).  "Such a statement must simply give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkewicz, 534 U.S. at 512.   Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (209), citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "Plaintiff must set forth sufficient factual matter accepted as true, to 'state a claim that is plausible on its face.'"  Iqbal, 129 S.Ct. at 1949, quoting Twombly, 550 U.S. at 555. While factual allegations are accepted as true, legal conclusions are not.  Iqbal, 129 S.Ct. at 1949.

Although accepted as true, "[f]actual allegations must be [sufficient] to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555 (citations omitted).  A plaintiff must set forth "the grounds of his entitlement to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."  Id. at 555-56 (internal quotation marks and citations omitted).  To adequately state a claim against a defendant, a plaintiff must set forth the legal and factual basis for his claim.  Plaintiff clearly alleges that TCI knew or should have

known of the danger to Plaintiff. The law is clear that the fact that Plaintiff was confined in a location where valley fever spores existed which caused him to contract valley fever fails to state a claim under the Eighth Amendment. King, 2009 WL 546212. Defendant TCI should therefore be dismissed.

## VII.    Conclusion and Recommendation

Defendants have come forward with evidence that establishes, without dispute, that Plaintiff was not subjected deliberate indifference to his serious medical needs and that his medical care was appropriate and within the community medical standards of care. Plaintiff has provided no evidence to the contrary. The Court finds that Defendants have met their burden by coming forward with evidence the establishes the lack of existence of a triable issue of fact. Plaintiff has not met his burden by coming forward with any evidence that Defendants Andrews, Craig, Bucholz, Akanno, Minnecci, Noriega, Nichols or Snellen were deliberately indifferent to his serious medical needs or that Defendants Taft Employees or Geo Group, Inc. were negligent. Defendants are therefore entitled to judgment as a matter of law. Plaintiff fails to state a claim against Defendant TCI.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants Andrew, Craig, Bucholz, Akanno, Minnecci, Noriega, Nichols, Snellen, Taft Employees and Geo Group, Inc. motions for summary judgment be granted and that judgment be entered in favor of Defendants and against Plaintiff;

2. Defendant TCI be dismissed from this action for Plaintiff's failure to state a claim upon which relief could be granted; and finally,

3. The Clerk be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served

28

and filed within five days after service of the objections.   The parties are advised that failure to file objections within the specified time waives all objections to the judge's findings of fact.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:**   **September 6, 2011**                          **/s/ Gary S. Austin**
                                                        UNITED STATES MAGISTRATE JUDGE

29